Janet L. BASTIN, on behalf of herself and all others similarly situated, Appellant–Plaintiff,

v.

FIRST INDIANA BANK and John Does 1–10, Appellees–Defendants.

No. 49A02–9703–CV–146.

Court of Appeals of Indiana.

April 27, 1998.

Rehearing Denied June 30, 1998.

---

Peter M. Racher, Jeffrey D. Featherstun, Alexandra S. Lipps, Plews Shadley Racher & Braun, Indianapolis; M. Scott Barrett, Barrett & Associates, Ltd., Chicago, IL, for appellant-plaintiff.

Theodore J. Nowacki and Monique C. Winkler, Bose McKinney & Evans, Indianapolis, for appellees-defendants.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Janet L. Bastin filed a complaint against First Indiana Bank ("First Indiana") which

alleged, in part, that First Indiana had breached a provision of her adjustable rate mortgage loan, which was evidenced by a note. On January 8, 1996, Bastin filed motions for class certification [1] and for summary judgment. On April 8, 1996, First Indiana filed a cross-motion for summary judgment. After a hearing on First Indiana's cross-motion for summary judgment, the trial court entered summary judgment in favor of First Indiana, and Bastin now appeals. The sole issue for our review is whether the trial court erred when it granted First Indiana's cross-motion for summary judgment.[2]

We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 16, 1984, Bastin obtained an adjustable rate mortgage loan from First Indiana in the amount of $23,750.00. Bastin's loan was evidenced by a note ("Note") and has been serviced by First Indiana since its inception. Unlike a fixed rate mortgage in which the interest rate remains the same throughout the life of the loan, Bastin's Note allows First Indiana to adjust Bastin's interest rate on September 1 and March 1 of each year. Attached to Bastin's Note is an Adjustable Rate Rider which provides in relevant part:

### 4. INTEREST RATE CHANGES

### (A) INTEREST CHANGE DATE

The interest rate that I will pay may change on the first day of March, 1985 and on that day every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

### (B) THE INDEX

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly auction average rate for United States Treasury bills with a maturity of 6 months, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this.

### (C) CALCULATION OF INTEREST

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding two and 25/100ths percentage points (2.25%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate and will be effective on each Interest Change Date and will remain in effect until the next Interest Change Date.

The average auction rate, or Index figure, that is used to determine Bastin's interest rate may be obtained from various sources. The Federal Reserve Board issues a publication known as Statistical Release H.15 (519) that is released each Monday and contains the index figure from the previous Monday's treasury auction.[3] In addition, *The Wall Street Journal* publishes the index figure the day after the auction, and an electronic service known as "Telerate" provides the figure the same day that the auction occurs. Because the H.15 is released approximately one week later than the other two sources, when the interest rates are rising, the borrower benefits from a bank's use of either the Telerate or *The Wall Street Journal* as the source for the Index figure. Similarly, when

---

1. Although Bastin moved for class certification, the trial court granted First Indiana's motion that the class certification issue be deferred until after the trial court determined the outcome of First Indiana's summary judgment motion. In its order, the trial court concluded that it would hear the parties' pending motions in the following order: (1) First Indiana's Motion for Summary Judgment, (2) class certification, and (3) Bastin's Motion for Summary Judgment.

2. Bastin appeals the trial court's grant of summary judgment in favor of First Indiana only as it relates to her breach of contract claim. She does not appeal the court's decision regarding the remaining claims stated in her complaint.

3. In cases where Monday is a federal holiday, the treasury auction and the publication of the Statistical Release H.15(519) are deferred to the next business day which is not a federal holiday.

the interest rates are falling, the borrower benefits from the use of the H.15.

From the date of inception of Bastin's Note until sometime in 1987, First Indiana relied on the index figure as published in *The Wall Street Journal* to adjust Bastin's interest rate.[4] Then, First Indiana began to obtain the index figure from the Federal Reserve Board's H.15 publication. First Indiana provided Bastin with notice of interest rate changes, which included the specific index values that it had used to compute Bastin's new interest rate. However, First Indiana never informed Bastin that it had switched from *The Wall Street Journal* to the H.15 publication as the source for the index figure.

On December 11, 1995, Bastin filed suit on behalf of herself and all other similarly situated borrowers against First Indiana alleging that First Indiana had charged excessive interest on the adjustable rate mortgage loans that it owned and serviced. In both her complaint and motion for summary judgment, Bastin maintained that First Indiana had breached the Note because the H.15 publication which it used was not the "most recent index figure available." Rather, in order for First Indiana to comply with the terms of the Note, Bastin argued that First Indiana should have continued to use the index figure from *The Wall Street Journal*.

After First Indiana filed its cross-motion for summary judgment, the trial court held the hearing on First Indiana's motion. However, at that hearing, Bastin presented an alternative argument that if the H.15 source is proper under the Note, then First Indiana breached the Note when previously it had used *The Wall Street Journal* as its source for the index figure. First Indiana objected to Bastin's argument on the grounds that Bastin's new position represented a separate and different claim than the one that Bastin had asserted in her complaint. The trial court granted First Indiana's cross-motion for summary judgment.

## DISCUSSION AND DECISION

### Standard of Review

The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Monon Corp. v. Townsend*, 678 N.E.2d 807, 809 (Ind.Ct.App. 1997), *trans. denied.* Summary judgment is appropriate when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C). The movant bears the burden of establishing the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed in the light most favorable to the non-moving party. *Ramon v. Glenroy Constr. Co.*, 609 N.E.2d 1123, 1127 (Ind.Ct.App.1993), *trans. denied.*

When reviewing a decision upon a motion for summary judgment, this court is bound by the same standard as the trial court. *Webb v. Jarvis*, 575 N.E.2d 992, 994 (Ind. 1991). We stand in the shoes of the trial court and liberally construe all designated evidentiary material in favor of the nonmoving party. *Rotec, Div. of Orbitron, Inc. v. Murray Equip. Inc.*, 626 N.E.2d 533, 535 (Ind.Ct.App.1993). We may only consider those parts of the pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and other matters which have been designated by the parties to the trial court for consideration. T.R. 56(C); *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). In order to prevail on appeal when a summary judgment motion has been granted in favor of an opposing party, the appealing party must establish the existence of a genuine issue of material fact from the designated materials. *Thompson v. Murat Shrine Club, Inc.*, 639 N.E.2d 1039, 1040 (Ind.Ct.App.1994). Where the facts are not in dispute, summary judgment is inappropriate only when the factfinder may reasonably draw conflicting inferences from the undisputed facts. *Nobles v. Cartwright*, 659 N.E.2d 1064, 1071 (Ind.Ct. App.1995).

4. In Bastin's complaint, she alleges that First Indiana used the "Telerate method." However, in her brief she alleges that First Indiana used

*The Wall Street Journal* and states that the two "methods" are "essentially the same." Brief of Appellant at 8.

### Bastin's Substantive Claims

Bastin asserts four arguments in support of her contention that the trial court erred when it granted First Indiana's cross-motion for summary judgment: (1) the two interest rate adjustment sources utilized by First Indiana cannot both be "the most recent Index figure available," (2) the H.15 source cannot be the "most recent Index figure" under the Note when the H.15 statistical release contains the Index from the previous week's treasury auction, (3) the Note's adjustment rate provision is ambiguous, and (4) there is a genuine issue of material fact concerning when the Federal Reserve Board "makes available" the index figure.

### a. *First Indiana's Use of the Two Adjustment Sources* [5]

As an initial matter, the parties dispute whether Bastin has attempted to adopt a different breach of contract theory than that asserted in her complaint. Specifically, First Indiana contends that one of Bastin's arguments, which was initially presented at the summary judgment hearing and focuses on First Indiana's switch in index figure sources, is a separate and distinct claim from the theory she asserted in her complaint. In response, Bastin argues that, both in her complaint and throughout the proceedings, she has consistently argued that First Indiana's switch from *The Wall Street Journal* to the H.15 source was improper and violated the terms of the Note. Bastin maintains that pursuant to notice pleading under Indiana Trial Rule 8(A), she was not required to delineate a specific legal theory to which she would adhere throughout trial.

■ Trial Rule 8 defines the general rules of pleading. It provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief to which the pleader deems entitled." Ind.Trial Rule 8(A)(1)–(2). Under notice pleading, the issue of whether a complaint sufficiently pleads a certain claim depends on whether the opposing party has been sufficiently notified so as to be able to defend the claim. *Noblesville Redevelop. Com'n. v. Noblesville Assoc. Ltd.*, 674 N.E.2d 558, 563–64 (Ind.1996) (citations omitted). Stated differently, "a complaint's allegations are sufficient if they put a reasonable person on notice as to why plaintiff sues." *Id.* at 564 (citing *Capitol Neon Signs, Inc. v. Indiana Nat'l Bank*, 501 N.E.2d 1082, 1085 (Ind.Ct.App. 1986)).

■ Here, Bastin's complaint provides in relevant part:

3. Plaintiff brings this action on behalf of all persons subjected to this unlawful practice to obtain: (1) a declaratory judgment stating that First Indiana's practices are illegal; (2) an order requiring First Indiana to recompute the affected mortgages so that the excessive interest charges and profits earned thereon are credited to principal; and, (3) other relief which the Court deems proper.

\* \* \* \* \* \*

16. For each and every interest rate adjustment *on and after September 1, 1988 adjustment,* First Indiana *improperly used the H15 method* to adjust the interest rates on class members' ARM loans. [footnote omitted] Under the H15 method, the applicable "auction average yield" or "auction average (investment) yield" is deemed at hand, capable of being used, usable or "available" exactly [footnote omitted] one week later than the related Treasury Bill auction.

17. First Indiana *did not disclose the change in the method* of interest rate adjustment calculations. The owners of the loans (First Indiana and/or John Does 1–10) collected interest on the plaintiff's mortgage loan under both the telerate and H15 methods.

(emphasis added). Then, during the summary judgment hearing, Bastin's counsel argued that the "switch in adjustment methods" argument had been plead sufficiently in the complaint. We agree. While Bastin has consistently maintained that First Indiana's

---

5. We note that in their briefs, the parties refer to the various "sources" by which First Indiana can obtain the average auction rate as "methods." These terms will be used interchangeably throughout the opinion.

previous use of *The Wall Street Journal* was correct under the terms of the Note and that its current use of the H.15 publication is improper, she also argues that both sources cannot be correct under the Note. Thus, Bastin asserts that if the H.15 publication is the correct source for obtaining the weekly auction average, then First Indiana's previous use of *The Wall Street Journal* as the source was incorrect. We conclude that this argument is a natural corollary to Bastin's original assertion that First Indiana's reliance on the H.15 publication is improper. Therefore, the argument does not present a new legal theory.

Nevertheless, we agree with the trial court's finding which states:

> 10. The Note is not ambiguous. Therefore, it is a question of law for the Court to determine what the language of the Note means and apply it to the undisputed facts. *The Court is not bound by an erroneous interpretation placed on the contract by a party. That First Indiana may have interpreted the Note at an earlier time in a different way than it does now cannot change the meaning of the Note.*

(emphasis added). We are asked to interpret the Note as it is now administered and, thus, we agree with the trial court that we need not consider whether a previous interpretation of the Note by First Indiana was erroneous. *See City of Evansville v. Old State Utility Corp.*, 550 N.E.2d 1339, 1342 (Ind.Ct.App.1990) (if the meaning of the contract is clear, its effect will not be controlled by an erroneous construction placed upon the agreement by the parties). Therefore, despite that fact that Bastin's "switch in methods" argument was sufficiently plead under Trial Rule 8(A), we need not address that argument on appeal.

#### b. *Interpretation of the Note*

Bastin argues that First Indiana's use of the Federal Reserve Board's H.15 publication is improper under the Note because it is

not the "most recent Index figure available." Bastin also argues that the Note provision is ambiguous as to which Index figure source should be used. Finally, Bastin maintains that a genuine issue of material fact exists regarding when the Federal Reserve Board makes "available" the Index figures.

Although not binding authority on this court, we find the United States Court of Appeals decision in *Bastin v. Federal Nat. Mortg. Ass'n*, 104 F.3d 1392 (D.C.Cir.1997) to be both instructive and persuasive in addressing Bastin's arguments. In that case, Thomas E. Bastin and other similarly situated mortgagees brought a nearly identical class action suit against Federal National Mortgage Association ("Fannie Mae") for alleged miscalculations of interest rates on residential adjustable rate mortgage loans.[6] In 1984, Thomas, like the appellant here, received an adjustable rate mortgage loan from First Indiana with an identical Adjustable Rate Rider provision. *Id.* at 1393. However, in that case, First Indiana had sold Thomas' loan to Fannie Mae in 1991. *Id.* Since 1991, Fannie Mae has required the institutions that service its adjustable rate mortgages to use the H.15 publication for the Index figure because "that is the earliest date that these rates are made available by the Federal Reserve Board (even though they may be available from other sources earlier)." *Id.* at 1394. Thomas filed his class action complaint which alleged that pursuant to the mortgage contract, Fannie Mae is required to use either Telerate or a Federal Reserve hotline "because they are sources that provide (in the terms used by the Adjustable Rate Rider) 'the most recent Index figure available.'" *Id.* In response, Fannie Mae filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The district court informed the parties that he would treat Fannie Mae's motion as one for summary judgment and ultimately entered summary judgment in favor of Fannie Mae. *Id.*

---

**6.** We note that Thomas Bastin is a relative of Janet Bastin, the appellant in this case, and that both Bastins are represented by M. Scott Barrett. The record indicates that at the time the parties appeared for the summary judgment hearing in this case, Thomas Bastin had appealed the United States District Court's decision to grant Fannie Mae's motion to dismiss. Here, the trial court issued its findings and conclusions prior to the date that the United States Court of Appeals handed down its decision, which occurred on January 21, 1997.

On appeal, Thomas asserted three arguments identical to those presented here.[7] *Id.* at 1395. In its decision, the Court of Appeals stated that "none of [Thomas'] three interpretations has any merit because the interest rate provision unambiguously permits the use of Release H.15 as the source of the six-month T–bill rate." *Id.* The court concluded that after reading the interest rate provision as a whole, "it is obvious that the term 'Index' in the phrase 'Current Index' is the term defined in the previous sentence as the rate 'made available by the Federal Reserve Board.'" *Id.* The court concluded further that "Release H.15 is the only medium through which the Federal Reserve Board makes the weekly T–bill auction average rate available" despite Thomas' speculation that the Federal Reserve Board implemented some type of hotline. *Id.* The court affirmed the district court's decision to grant Fannie Mae's motion to dismiss.

Here, Bastin argues that the H.15 publication is not the "most recent Index figure available" and, thus, that First Indiana has breached the terms of the Note. In the alternative, Bastin maintains that the language in the Note is ambiguous. The Adjustable Rate Rider provision at issue here, as well as in *Bastin,* provides:

(B) THE INDEX
Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly auction average rate of the United States Treasury bills with a maturity of 6 months, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

■ Ambiguity in a contract results only when a contract is susceptible to more than one interpretation, and reasonably intelligent persons would differ as to its meaning. *Smith v. Allstate Ins. Co.,* 681 N.E.2d 220, 223 (Ind.Ct.App.1997). A contract is not am-

biguous because a controversy exists where each party favors a different interpretation, and a term is not ambiguous simply because it is not defined. *Id.* If the contract is unambiguous, its construction is generally a question of law for the court, which makes summary judgment particularly appropriate in contract disputes. *Robinson v. Century Personnel, Inc.,* 678 N.E.2d 1268, 1270 (Ind. Ct.App.1997), *trans. denied.*

■ Like the United States Court of Appeals in *Bastin,* we conclude that the interest rate provision at issue is subject to only one reasonable interpretation. The word "Index" that appears in the second sentence is the same Index referred to in the phrase "Current Index." Further, contrary to Bastin's argument, the Note does not require First Indiana to use the Index figure "as published in *The Wall Street Journal*" or "as published by the Telerate method." Rather, the "Current Index" or "Index" to be implemented by First Indiana is the "most recent Index figure" that is "made available by the Federal Reserve Board." Despite the availability of the weekly auction average through various secondary sources, the Note clearly permits First Indiana to use the Index figure that is made available by the Federal Reserve Board.

Finally, Bastin maintains that the trial court erred when it entered summary judgment because conflicting evidence was presented concerning whether the Federal Reserve Board makes Treasury auction results available through sources *other* than the H.15 publication. Regarding this issue, the trial court issued the following finding:

5. Although the results of the Monday auction of United States Treasury Bills with a maturity of six months is known in the marketplace and disseminated by various means on the day of each auction, the first time the Federal Reserve Board (the "FRB") makes available the weekly average results of the Treasury Department's

---

**7.** First, Thomas argued that Fannie Mae was required to use Telerate or the Federal Reserve hotline, and not the H.15 publication, because only those sources report the "most recent Index figure available." *Id.* at 1395. Second, Thomas argued that the mortgage contract is ambiguous

because it could be interpreted as requiring either Telerate or the hotline. Finally, Thomas maintained that a genuine issue of material fact existed regarding whether the Federal Reserve Board actually disseminated its Index figure via the hotline. *Id.*

auction is on the date the FRB releases its Statistical Release H.15 entitled "Selected Interest Rates." The H.15 is an official government publication bearing the seal of the FRB. On its face, the H.15 is released each Monday and bears a release date. This means that the H.15 is reporting the weekly averages for the preceding week as the current weekly averages under the heading "This week." With respect to the auction of six-month Treasury bills, the H.15 reports as "this week's" weekly auction average, the auction average for the auction conducted Monday of the preceding week. The undisputed evidence is that the FRB does not make the "This week" weekly averages contained in a specific H.15 available prior to the day on which the H.15 is released.

(citations omitted).

In support of her argument that a genuine issue of material fact exists, Bastin directs us to two conflicting, designated affidavits. First Indiana presented the sworn declaration of Joseph R. Coyne, who is the Assistant for Public Affairs to the Board of Governors of the Federal Reserve Board. In his declaration, Coyne stated that "the policy and practice of the Federal Reserve Board is to release the interest rate information contained in Statistical release H.15(519) through the publication of the document" and that "the Board has not established a process for making the information ... available through a telephone hotline, a computer network, or similar facility prior to the issuance of that Release."

Bastin alleges that the Coyne affidavit is contradicted by the affidavit of John M. Geddes, who is a founder and former principal of Consumer Loan Advocates, Inc., a non-profit consulting firm which identifies and corrects errors in adjustable rate mortgage loans, stated that he had contacted the Federal Reserve Board in 1991 and that the Board representative he spoke with "stated that members of the public *may be able to obtain* Treasury auction results [Index figure] from the Federal Reserve over the phone or through in-person inquiries or in other ways, as well as through publication of Statistical

Release H.15(519)." (emphasis added). Then, in response to First Indiana's allegation that H.15 is the sole way in which the Board makes the Index figure available, Geddes stated that "whether or not that is true today, this certainly has not always been the case based upon my experience and the many government agencies and lending institutions with whom I have talked regarding the 'availability' issue."

■■■ We are not persuaded that these affidavits create a genuine issue of material fact that precludes summary judgment. A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue. *Schwartz v. Castleton Christian Church, Inc.*, 594 N.E.2d 473, 475 (Ind.Ct.App.1992), *trans. denied.* To be a "genuine issue of fact" within the meaning of summary judgment rules, the claim must have legal probative force. *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 280 (Ind.1983); *See Gaboury v. Ireland Road Grace Brethren, Inc.*, 446 N.E.2d 1310, 1313 (Ind.1983) (to be considered "genuine" under Rule 56, sufficient evidence of the claimed factual dispute must be established so that a trier of fact is required to resolve the parties' differing versions). Here, Geddes' speculates that the Federal Reserve Board, at some time in the past, may have made available the Index figure prior to its release of the H.15 publication.[8] However, Coyne, who has been employed with the Federal Reserve Board since 1968, makes it clear that the Federal Reserve Board has not made that information available by any medium other than by the release of the H.15 publication. We conclude that the undisputed evidence shows that the Federal Reserve Board does not make available the weekly auction average before the official release date of the H.15 publication. Thus, these affidavits create no genuine issue of material fact.

## CONCLUSION

We conclude that the Note's interest rate provision is not ambiguous and that under

---

8. The statements in Geddes' affidavit also qualify as hearsay under Ind.Evid.Rule 801(c).

the terms of the Note, First Indiana may use the most recent Index figure as made available by the Federal Reserve Board and not from a secondary source. We further conclude that the only source of the weekly treasury auction average released by the Federal Reserve Board is the H.15 publication, which is now available in both its traditional printed form and on the Internet.[9] First Indiana has not breached the Note by using the H.15 statistical release as its source for obtaining the Index figure. Therefore, the trial court did not err when it granted First Indiana's cross-motion for summary judgment.

Affirmed.

BAKER and RILEY, JJ., concur.

---

**9.** The Federal Reserve Board publishes the Statistical Release H.15 on its Internet Website at http://www.bog.frb.fed.us /releases/H15/current/.

This electronic version made available by the Federal Reserve Board provides the same information as that contained in the printed form.